IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DARRELL CAMPBELL, et al., | |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER ON PENDING MOTIONS |
| vs. | |
| CASTLE STONE HOMES, INC., et al., | Case No. 2:09-CV-250 TS |
| Defendants. | |

The Court has before it (1) Castle Stone Homes, Inc., Martin Tanner, Mills Crenshaw, and Robert Wright's (collectively, "Castle Stone") Motion to Dismiss;[1] (2) the National Credit Union Administration Board's ("the NCUAB") Motion to Dismiss;[2] (3) Cross/Counterclaim Defendants' Motion to Dismiss;[3] (4) Crossclaim Defendant Judy L. Smith's Motion to Strike Third-Party Complaint and to Dismiss Third-Party Complaint for Lack of Subject Matter

_____

[1]Docket No. 66.

[2]Docket No. 68.

[3]Docket No. 39.

1

Jurisdiction and Joinder in Motion to Dismiss;[4] and (5) Cross/Counterclaimant Castle Stone's Motion for Leave to Recharacterize or Add Parties.[5]

These matters are fully briefed and ripe for decision. Having reviewed the parties' respective arguments, the Court issues the following Order.

## I. MOTION TO DISMISS STANDARD

As all but one of the pending motions concerns dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court will set forth the Rule 12(b)(6) standard at the outset. In considering a motion to dismiss under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to Plaintiffs as the nonmoving parties.[6] Plaintiffs must provide "enough facts to state a claim to relief that is plausible on its face."[7] All well-pleaded factual allegations in the amended complaint are accepted as true and viewed in the light most favorable to the nonmoving party.[8] But, the court "need not accept . . . conclusory allegations without supporting factual averments."[9] "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence

---

[4]Docket No. 41.

[5]Docket No. 50.

[6]*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[7]*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

[8]*GFF Corp.*, 130 F.3d at 1384.

[9]*Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998); *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991).

that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[10]

## II.  CASTLE STONE'S MOTION TO DISMISS

### A.     BACKGROUND

The following facts are taken from Plaintiffs' Complaint[11] and are viewed as true for purposes of deciding Castle Stone's Motion to dismiss.

Castle Stone provides general contractor services in the State of Utah, focusing primarily on building residential homes.  Plaintiffs allege that during 2005 to 2007, Castle Stone solicited individuals with good credit scores through radio, Internet, print, and other public advertisements to invest in a real estate investment scheme.  These advertisements, Plaintiffs allege, marketed the investment scheme as a "creative way to profit in real estate" and required "no cash out of pocket."[12]  Further, Plaintiffs allege that the investment scheme was represented to potential investors as having little or no risk.

The investment scheme, Plaintiffs allege, used individual investors' good credit scores to obtain financing through Castle Stone's preferred lender and Castle Stone would then use that financing to construct, market, and sell an investment home.  Plaintiffs maintain that Castle Stone promised once the investment home was sold, Castle Stone would split the profits with Plaintiffs.

---

[10]*Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[11]Docket No. 2.

[12]*Id.* at 11.

Plaintiffs are all individuals who allege to have invested in this scheme. Each Plaintiff signed a document entitled "Client Contract (for 'Spec' Home)"[13] ("Client Contract") with Castle Stone, in which Castle Stone made promises concerning the timing and cost of constructing the house as well as the marketing and sale of the homes. In the Client Contract, under a paragraph entitled "Equity and Guaranteed Client Profit," Castle Stone promises to build each home for eighty-percent of the final appraised value and promises the client a certain percentage of the twenty-percent profit.[14] The Client Contract also requires the client to execute a Power of Attorney in favor of Castle Stone and also gives Castle Stone the right to file with the County Recorder's Office a notice of interest in the property, a lien interest, or have a deed from the client.

Financing for these Client Contracts was initially provided through America First Credit Union ("America First") and Construction Capital Source ("Construction Capital"). These loans, however, were eventually called due by these lending institutions. On or about November 1, 2006, Plaintiffs who had obtained loans through America First received a "Notice of Intent to Foreclose" from America First, which stated that the loan was being "declared due in full" because:

> [T]he construction loan was given on the representation that this was an owner occupied home when, in fact, it is not. In addition, work did not commence on the improvements to be built on the property within thirty (30) days as required by the Construction Agreement dated August 11, 2006.[15]

---

[13]*Id.* at Ex. 2.

[14]*Id.*

[15]*Id.* at Ex. 3.

Plaintiffs allege that they remembered marking on their loan application that this was an "investment" home, only to discover on the final loan documents that this designation had been changed to "owner occupied."

On or about April 2, 2007, Plaintiffs who had obtained loans through Construction Capital received notice that their loan funds had been "frozen" allegedly because construction had not been finished within the time specified in the loan documents.[16]

After these loans were called due, Caste Stone informed Plaintiffs that it had arranged financing through HeritageWest Credit Union ("HeritageWest"). Plaintiffs allege that all subsequent investments were financed through HeritageWest. As the activities of HeritageWest are the subject of the NCUAB's Motion to Dismiss, the Court will discuss the allegations against HeritageWest in that section.[17]

Plaintiffs allege that in the first half of 2008, HeritageWest and Castle Stone began informing Plaintiffs that their construction loans were nearly exhausted although homes were only fifty to seventy-five percent completed. On or about June 24, 2008, Castle Stone issued a "Progress Report" to all of its existing clients, in which Castle Stone informed its clients that it had reached an agreement with HeritageWest to proceed with loan modifications without first receiving appraisals and that Castle Stone's realtor "has found buyers to purchase virtually all our homes."[18] Most of the Plaintiffs thereafter entered into additional loans with HeritageWest.

---

[16]*Id.* at Ex. 4.

[17]*See infra*, Part III.

[18]*Id.* at Ex. 12.

Plaintiffs allege that even after receiving these additional funds, Castle Stone failed to complete the homes in the time frame set forth in the parties' agreements. As the time frame expired, Castle Stone and HeritageWest negotiated a series of loan extensions which were offered to Plaintiffs.

Plaintiffs allege that throughout the construction of their homes, Castle Stone failed to act reasonably as project manager and supervisor, which led to delays in construction and exhausted loan funds before the homes were completed. Plaintiffs also allege that while Castle Stone promised to build Plaintiffs homes of the finest quality, the quality of the construction is uniformly poor and substandard. Plaintiffs allege specific defects of mismatched or incomplete plumbing and gas lines, cracks in exterior stucco, irregular or misplaced roof shingles, un-level shelving and cabinetry, missing appliances and air-conditioning units, and cracked and shoddy tile work.

Plaintiffs filed their Complaint in March of 2009, alleging twelve separate causes of action, ten of which are relevant to this motion.[19] Plaintiffs allege that Castle Stone's Client Contracts are unregistered securities, sold in violation of section 12(1) of the Securities Act (First Cause of Action), section 12(2) of the Securities Act (Second Cause of Action), and that the fraudulent marketing and sale of these securities violated Section 10(b) of the Exchange Act and Rule 10b-5 (Third Cause of Action). Further, Plaintiffs allege that Castle Stone's Client

---

[19]The two causes of action not relevant to this motion are for fraudulent transfer (Fifth Cause of Action alleged against HeritageWest and related individuals) and for breach of fiduciary duty (Twelfth Cause of Action alleged against HeritageWest).

Contracts are unregistered securities, sold in violation of the Utah Uniform Securities Act[20] (Fourth Cause of Action). Plaintiffs further allege that Castle Stone committed negligent misrepresentations (Sixth Cause of Action); breached its contracts with Plaintiffs (Eighth Cause of Action); breached its covenant of good faith and fair dealing with Plaintiffs (Ninth Cause of Action); has made an adverse claim on Plaintiffs' interest in real property, entitling Plaintiffs to quiet title against Castle Stone (Tenth Cause of Action); and committed conversion and waste (Eleventh Cause of Action).

B.     DISCUSSION

Castle Stone moves to dismiss the above listed causes of action as alleged against it.  The Court will address each of these contentions in turn.

 1.     *Federal Securities Law Violations*

Castle Stone argues that Plaintiffs' claims for federal securities law violations should be dismissed because the Complaint fails to adequately allege the existence of a security, scienter, loss causation, or show that the statute of limitations has not run.

 a.     *Existence of a Security*

Castle Stone argues that Plaintiffs' First, Second, and Third Causes of Action fail as a matter of law because Plaintiffs have not adequately alleged that the Client Contracts are securities under federal law.  Specifically, Castle Stone argues that, contrary to Plaintiffs' allegations, the Client Contracts fail to meet the criteria of an "investment contract" as set forth by relevant federal case law.

---

[20]Utah Code Ann. § 61-1-13(1)(x)(i).

At the outset, the Court notes that determining whether a particular contract is an investment contract under federal securities law is a question of fact that is rarely appropriate on consideration of a motion to dismiss.[21] Only when there are no reasonable allegations to support the existence of an investment contract may a court grant a motion to dismiss a security claim.[22]

In the seminal decision *SEC v. W.J. Howey*,[23] the Supreme Court announced that a particular scheme or transaction is an "investment contract," and thus a security for purposes of federal securities laws, if: "[1] the scheme involves an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others."[24] The *Howey* test is considered a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits."[25]

Defendants argue that Plaintiffs have failed to allege a common enterprise. Castle Stone claims that Plaintiffs have failed to allege either horizontal or vertical commonality, and this failure alone is fatal to Plaintiffs' claims. In support of this argument, Castle Stone cites to the Tenth Circuit's decision, *McGill v. American Land & Exploration Co.*[26] Review of this decision,

---

[21]*De Marco v. LaPay*, 2009 WL 3855704, at *4 (D. Utah Nov. 17, 2009).

[22]*Id.*

[23]328 U.S. 293 (1946).

[24]*Id.* at 300.

[25]*SEC v. Edwards*, 540 U.S. 389, 393 (2004).

[26]776 F.2d 923 (10th Cir. 1985).

however, reveals that the Tenth Circuit has expressly rejected such "rigid" requirements, and instead looks to the "'economic reality' of the transactions that occurred."[27]  Thus, the "determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit."[28]

Looking at the economic reality of the present transaction between Castle Stone and Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged an investment scheme advertised as an opportunity for profit.  Plaintiffs have alleged numerous advertisements and other representations which advertise Castle Stone's building efforts as an investment opportunity aimed at creating wealth, not just homes, for its clients.  More importantly, the Client Contracts themselves speak of "Guaranteed Client Profit" and provide a summary of how any such profits will be distributed.  These allegations are sufficient to allege a common enterprise.

Defendants further argue, based on this Court's decision in *De Marco v. LaPay*,[29] Plaintiffs must allege a collateral agreement with the seller or some other limitation on the owner's control over the property for there to be a common enterprise.  This language from *De Marco*, however, is based on a 1973 release by the SEC concerning the applicability of federal securities laws to offers and sales of condominiums or units in a real estate development.[30]  The Court finds this reasoning inapplicable to the present situation, where Castle Stone was engaged

---

[27]*Id.* at 925.

[28]*Berrios-Bones v. Nexidis, LLC*, 2007 WL 3231549, at *5 (D. Utah Oct. 30, 2007).

[29]2009 WL 3855704, at *4-5.

[30]*See id.* at *5.

9

in the development of residential homes.  Moreover, the alleged investment scheme in *De Marco* was distinguishable from the present situation because the *De Marco* plaintiffs were not told anything specific about expected profits.  In the present action, Plaintiffs were promised specific returns in the Client Contracts.

The Court finds that Plaintiffs have sufficiently alleged the existence of an investment contract and, by extension, a security under federal law.  Therefore, the Court will deny Castle Stone's Motion on this ground.

      *b.*    *Scienter*

Castle Stone argues that Plaintiffs' claims under Section 10(b) and Rule 10b-5 should be dismissed because Plaintiffs have failed to allege scienter with the requisite specificity.  Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."[31]  To plead the required state of mind, scienter, a plaintiff must allege that defendant had "intention to deceive, manipulate, or defraud."[32]  In interpreting the PLSRA requirement that a "strong inference" of scienter be plead, the Supreme Court has explained that the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[33]

---

[31] 15 U.S.C. § 78u-4(b)(2).

[32] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

[33] *Id.* at 314.

The Tenth Circuit has determined that:

> Recklessness, defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," can also satisfy the scienter requirement for Section 10(b).[34]

When considering whether scienter has been sufficiently alleged, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters in which a court may take judicial notice."[35]

Viewing the Complaint as a whole, the Court finds that Plaintiffs have adequately alleged scienter. Plaintiffs allege that Castle Stone repeatedly represented this investment as a low risk investment opportunity, and marketed the opportunity as a no up-front cost opportunity to make profit on one's good credit score. These allegations alone are sufficient to allege reckless scienter on the part of Castle Stone.

Castle Stone argues that these alleged statements by Castle Stone were extinguished by the Client Contracts' integration clause.[36] The Court is not satisfied that the integration clause contained in the Client Contracts is so broad as to extinguish all claims by Plaintiffs which allegedly fall outside the four-corners of the Client Contracts. Traditionally, an integration clause is important in deciding whether oral promises outside of the four-corners of the contract should

---

[34]*City of Phila. v. Flemming Cos., Inc.*, 264 F.3d 1254, 1258 (10th Cir. 2001) (quoting *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir.1996)).

[35]*Tellabs, Inc.*, 551 U.S. at 322.

[36]*See* Docket No. 2, Ex. 2 at ¶ 43.

be honored.[37]  In such situations, the application of an integration clause is clear and the oral promises will generally not be considered.  The applicability of this doctrine, however, is less clear when a plaintiff brings claims rooted in pre-contractual fraud.[38]  As discussed by Justice Billings of the Utah Supreme Court, it makes little sense, as a matter of policy, to allow a party to induce a contract through fraud and then avoid liability by generally disclaiming any prior statements in the written agreement.[39]

Plaintiffs' Section 10(b) claims relate to Castle Stone's efforts to *induce* Plaintiffs to enter into the Client Contracts, not Castle Stone or Plaintiffs' efforts to *enforce* the Client Contracts. Because these claims are rooted in pre-contractual fraud, and are not simply an effort by Plaintiffs to enforce an oral promise made outside of the four corners of the contract, the Court finds dismissal on the integration clause inappropriate at this stage of the proceedings.

> c.      *Loss Causation*

Castle Stone argues that Plaintiffs' Complaint fails to allege lost causation, which is an essential element of Plaintiffs' prima facie case under 10(b).[40]  As Plaintiffs demonstrate in

---

[37]*See, e.g.*, *Tangren Family Trust v. Tangren*, 182 P.3d 326, 332 (Utah 2008) (holding that "[e]xtrinsic evidence of a separate oral agreement is not admissible on the question of integration where the contract at issue contains a clear integration clause").

[38]*See Robinson v. Tripco Invest., Inc.*, 21 P.3d 219, 225 (Utah 2000) (Billings, J., concurring & dissenting).

[39]*Id.*

[40]*See In re Williams Securities Litigation*, 558 F.3d 1130, 1136 (10th Cir. 2009).

opposition, however, Plaintiffs have sufficiently alleged "some indication of the loss and causal connection."[41] Therefore, the Court will deny this ground for relief.

> ### d.      Statute of Limitations

Castle Stone further argues that Plaintiffs' federal securities law claims are barred by the applicable statute of limitations. Under federal law, a federal securities claim must be "brought not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."[42] Plaintiffs' allegations clearly meet the outer five year limitation, having alleged activities that commenced in 2005, and having filed their Complaint in March of 2009. The only issue for the Court, then, is "(1) whether plaintiffs were on 'inquiry notice' more than two years before they filed this action, and (2) whether, in the exercise of reasonable diligence, plaintiffs should have discovered the facts underlying the allegedly fraudulent activity more than two years before filing suit."[43] The allegations in Plaintiffs' Complaint raise a sufficient question as to whether Plaintiffs were, or should have been, on inquiry notice to survive a motion to dismiss. The Court will therefore deny the motion on these grounds.

> ### 2.      Utah Securities Law Violation

Castle Stone argues that Plaintiffs' Fourth Cause of Action should be dismissed because Plaintiffs have not alleged a security under Utah law. Castle Stone directs the Court's attention

---

[41]*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

[42]28 U.S.C. § 1658(b).

[43]*Jackson v. John Hancock Fin. Serv., Inc.*, 2006 WL 2710327, at *3 (D. Kan. Sept. 20, 2006).

to Section 61-1-13 of the Utah Code, which specifically excludes transactions involving a "whole long-term estate."[44] A "whole long-term estate" is defined as "a person or persons through joint tenancy owns real property through: (i) a fee estate; (ii) a life estate; or (iii) other long-term estate."[45]

Defendant argues that every Plaintiff in this action acquired title as sole owner or joint tenant with a spouse, relative or friend. Plaintiffs do not dispute this fact. Instead, Plaintiffs contend that the purpose of the investment scheme was for the development and resale of property as an investment. Plaintiffs then point out to the Court that Utah case law has adopted the *Howey* test, with slight variations, implicitly arguing that any finding of this Court under federal law is applicable under the Utah statute.

Although the *Howey* test is certainly instructive in determining whether a particular investment scheme is a security, Plaintiffs have not brought forth any Utah case law where Utah courts have used the *Howey* test to avoid the clear statutory text of the Utah Code. Moreover, the Court could find no such case law supporting Plaintiffs' position.

Looking at the transaction alleged here, the Client Contract states that title shall be held in the clients, i.e., Plaintiffs' name.[46] Although the Client Contract gives Castle Stone the right to claim an interest in the property, this right does not negate the clear requirement that the Plaintiffs hold title to the property in their name. The Court, therefore, finds that the whole long-

---

[44]Utah Code Ann. § 61-1-13(1)(x)(ii)(C)(I).

[45]*Id.* § 61-1-13(1)(cc).

[46]*See* Docket No. 2, Ex. 2 at ¶ 13.

term estate exception applies and Plaintiffs' claim fails as a matter of law.  The Court will therefore grant Castle Stone's motion on this ground and dismiss Plaintiffs' Fourth Cause of Action.

>    3.    *Negligent Misrepresentation*

Castle Stone argue that Plaintiffs' Sixth Cause of Action should be dismissed because Plaintiffs have failed to allege specific allegations of negligent misrepresentation.  Defendants further argue that, because the Client Contracts had contained an integration clause, Plaintiffs' claims are limited to only those statements contained in the Client Contracts.

As discussed previously, the application of the integration clause to claims of pre-contractual fraud or misrepresentations is not clear and therefore inappropriate for a motion to dismiss.  Even if this Court were to accept Castle Stone's arguments and find the integration clause applicable to these claims, the Court finds that Plaintiffs have sufficiently alleged negligent misrepresentations in the Client Contracts and in the parties' interactions after the contracts were executed.  Therefore, the Court will deny this ground for relief.

>    4.    *Breach of Contract & Breach of Covenant of Good Faith and Fair Dealing*

Castle Stone argues that Plaintiffs' Eighth and Ninth Causes of Action for breach of contract and breach of covenant of good faith and fair dealing should be dismissed as to the individual Defendants Martin Tanner, Mills Crenshaw, and Robert Wright ("Individual Defendants").  These Defendants argue that the Complaint fails to allege any contractual relationship among them and the Plaintiffs.

As to the breach of contract claim, Plaintiffs respond that 15 U.S.C. § 77o requires these

individuals be held liable as controlling persons of Castle Stone Homes, Inc.  The Court,

however, finds this section inapplicable to the present situation.  From the Court's review of this

statute, this statute pertains to civil liability for communications made in conjunction with the

sale of securities, not general breach of contract claims as alleged here.

In carefully reviewing Plaintiffs' Complaint, the Court cannot locate, nor have Plaintiffs

identified, any allegations in the Complaint that support Plaintiffs' claims for breach of contract

as to these individuals.  Because Plaintiffs have failed to allege the existence of a contractual

relationship among these individuals and themselves, the Court will dismiss Plaintiffs' Eighth

Cause of Action as to the Individual Defendants.

As to Plaintiffs' breach of covenant of good faith and fair dealing claims, Plaintiffs

respond that the Individual Defendants should be held liable because a corporate officer can be

held liable for fraudulent acts he or she personally committed.[47]  Plaintiffs then proceed to detail

various tortious actions by Defendants which were allegedly in breach of the duty of good faith

and fair dealing.  Contrary to Plaintiffs' assertions, however, the breach of duty of good faith and

fair dealing is only applicable when the parties have entered into a written agreement.[48]  Indeed,

the whole purpose of the covenant is to protect "the other party's right to receive the fruits of the

---

[47]*See* Docket No. 71, at 16 (citing *Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 40
(Utah 2003)).

[48]*See MediaNews Group, Inc. v. McCarthey*, 494 F.3d 1254, 1263 (10th Cir. 1996) ("An
implied covenant of good faith and fair dealing is read into most, if not all, written agreements
governed by Utah law.").

contract,"[49] which fruit would be impossible to ascertain in the absence of a contractual relationship. Because Plaintiffs have failed to allege a written agreement among themselves and the individual Defendants, Plaintiffs' claims for breach of covenant of good faith and fair dealing fail as a matter of law. The Court will therefore dismiss Plaintiffs' Ninth Cause of Action as to the Individual Defendants.

> 6.    *Quiet Title*

Castle Stone moves to dismiss Plaintiffs' Tenth Cause of Action for Quiet Title because Plaintiffs have failed to allege that Castle Stone has claimed any interest in their property. In opposition, Plaintiffs direct the Court's attention to paragraph 13 of the Client Contracts, which gives Castle Stone the right to file a "a notice of interest in the property, a lien interest, or have a deed from Clients."[50] Plaintiffs argue that this gives Castle Stone Homes a "contingent interest" in the properties and therefore entitles Plaintiffs to proceed on their quiet title action.

In reply, Castle Stone argues that such a contingent interest is insufficient to plead a plausible quiet title claim. The thrust of Castle Stone's argument is that Plaintiffs have not alleged any *actual* competing or adverse claim by Castle Stone, but only Castle Stone's contractual *potential* to make such a claim. Castle Stone argues that such potential is insufficient to survive a motion to dismiss.

---

[49] *Geoffrey E. MacPherson, Ltd. v. Brincell, Inc.*, 98 F.3d 1241, 1245 (10th Cir. 1996).

[50] Docket No. 2, Ex. 2 at ¶ 13.

Under Utah law, "[a] person may bring an action against another person to determine rights, interests, or claims to or in personal or real property."[51]  This language is broad, including not just claims to title, but any right or interest an adverse party may assert in personal or real property.  The Court finds no reason to limit the statute, as Castle Stone suggests, to claims to title which have been actually asserted.  Moreover, Castle Stone has failed to bring any case law to the Court's attention which adopts its limited interpretation of Utah's quiet title statute.  The Court, therefore, will allow Plaintiffs to proceed on their quiet title claim.

7.     *Conversion and Waste*

Plaintiffs' Eleventh Cause of Action brings a combined claim for conversion and waste. Castle Stone argues that both of these claims within the Eleventh Cause of Action should be dismissed for failure to sufficiently allege the facts necessary to prevail on these claims.

From the Court's review of Plaintiffs' Complaint, Plaintiffs' claim for conversion consists of one paragraph: "Defendants also profited from construction loan draws for unearned fees and to pay for work that was not completed.  These draws constitute theft from Plaintiffs."[52] Castle Stone notes that these conclusory allegations fail to differentiate among the various Defendants, fail to identify which draws were allegedly stolen, or to which Plaintiffs these allegations apply.   The Court finds these conclusory allegations insufficient to survive a motion to dismiss. As noted by the Supreme Court, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the

---

[51]Utah Code Ann. § 78B-6-1301.

[52]Docket No. 2, ¶ 204.

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[53]  Therefore, the Court will dismiss Plaintiffs' claim for conversion.

As to Plaintiffs' claim for waste, the Court finds these allegations sufficient to survive a motion to dismiss.  To properly plead a claim for waste, a plaintiff must plead (1) an act constituting waste, (2) done by one legally in possession, and (3) the act damaged the property or owner.[54]  Plaintiffs have adequately alleged these elements.  The Court therefore will deny the Motion as to this ground for relief.

C.    SUMMARY OF FINDINGS

The Court will therefore dismiss Plaintiffs' Fourth Cause of Action, Plaintiffs' Eighth and Ninth Causes of Action as to Defendants Martin Tanner, Mills Crenshaw, and Robert Wright, and Plaintiffs' claim for conversion as part of their Eleventh Cause of Action.  As to all other Causes of Action, the Motion is denied.

### III. NCUAB'S MOTION TO DISMISS

The NCUAB moves this Court to dismiss all claims alleged against it as liquidator for HeritageWest Federal Credit Union.  The NCUAB argues that under 28 U.S.C. § 1787(p)(2) and the *D'Oench* doctrine, the NCAUB is shielded from the claims raised by Plaintiffs against it.

---

[53]*Twombly*, 550 U.S. at 555.

[54]*See Oquirrh Assoc. v. First Nat'l Leasing Co., Inc.*, 888 P.2d 659, 664 (Utah Ct. App. 1994).

A.     BACKGROUND

In Plaintiffs' Complaint, Plaintiffs allege several claims against HeritageWest Federal

Credit Union ("HeritageWest"), which all stem from HeritageWest's involvement in the

financing of Plaintiffs' transaction with Castle Stone Homes, Inc.  Plaintiffs allege that

HeritageWest's involvement in this transaction gave rise to HeritageWest's liability under federal

and state securities laws, contract, and tort.

After the filing of this Complaint, HeritageWest went into liquidation, where the NCAUB

currently serves as liquidator.  The NCAUB has now moved to dismiss all claims alleged against

HeritageWest.

B.     DISCUSSION

The NCAUB argues that all of Plaintiffs' claims raised against it as liquidator of

HeritageWest fail under the *D'Oench*[55] doctrine and the codification of that doctrine, 12 U.S.C. §

1787.  Under the codified version of the *D'Oench* doctrine applicable to NCAUB,

> No agreement which tends to diminish or defeat the right, title, or interest of the
> Board in any asset acquired by it under this subsection, either as security for a
> loan or by purchase, shall be valid against the Board unless such agreement—
> (A) shall be in writing;
> (B) shall have been executed by the credit union and the person or persons
> claiming an adverse interest thereunder, including the obligor, contemporaneously
> with the acquisition of the asset by the credit union;
> (C) shall have been approved by the board of directors of the credit union, which
> approval shall be reflected in the minutes of such board; and
> (D) shall have been, continuously, from the time of its execution, an official
> record of the credit union.[56]

---

[55]*D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942).

[56]12 U.S.C. § 1787(p)(2).

The NCAUB argues that none of agreements alleged by Plaintiffs, whether written or oral, survive the *D'Oench* doctrine and therefore require Plaintiffs' claims be dismissed.

At the outset, the Court notes that the agreements alleged by Plaintiffs fail to satisfy these statutory requirements. None were approved by the board of directors of HeritageWest and reflected in the minutes of HeritageWest's board. Therefore, if the *D'Oench* doctrine and its statutory codification apply, Plaintiffs claims fail.

Plaintiffs argue that the agreements and oral representations at issue in this case are distinguishable from the *D'Oench* doctrine and therefore survive the NCAUB's Motion to Dismiss. Focusing on the particular facts involved in *D'Oench*, Plaintiffs argue that they are not attempting to avoid enforcement of a financial agreement based upon a "secret" unwritten agreement, but rather are attempting to hold the NCAUB liable for HeritageWest's federal and state securities violations, breach of contract, negligent loan administration, and other tort based claims.

Although the *D'Oench* doctrine was born in the narrow circumstances asserted by Plaintiffs, "[s]ince 1942, federal courts have expanded the common law doctrine beyond the narrow facts of *D'Oench* . . ."[57] As explained by the Tenth Circuit:

> While the purpose underlying the *D'Oench* doctrine, to "permit regulators to accurately appraise the assets of savings institutions by allowing the regulators to rely on the assets' face value," has remained constant during its evolution, "its focus has shifted from the fraudulent, illegal, or secret character of the debtor's

---

[57]*FDIC v. Noel*, 177 F.3d 911, 917-918 (10th Cir. 1999).

acts to the effect the acts have on the regulatory agency's ability to evaluate quickly and accurately a savings institutions' assets."[58]

Given this evolution, today the *D'Oench* doctrine is "applicable to virtually any claim or defense that has the effect of adversely impacting the value of assets held by a federal banking regulator as a consequence of liquidation or receivership of a failed institution."[59] Thus, "any claim or defense which the National Credit Union Administration Board was not placed on notice and could not have determined from the books and records of the failed institution" is barred by the *D'Oench* doctrine.[60]

The Court finds the *D'Oench* doctrine applicable to the present action. The alleged agreements as described by Plaintiffs "tend[] to diminish or defeat the right, title, or interest of the Board in [the HeritageWest] asset[s] acquired by it . . . ."[61] Because the doctrine applies and the agreements fail to satisfy the statutory requirements for a qualified written agreement, the Court will grant the NCAUB's Motion to Dismiss.

In a footnote, the NCAUB further argues that because the NCAUB cannot be held liable, its agents Terry Elliot and Maria Powell also cannot be held liable and the claims raised against these individuals should be dismissed. The Court agrees. Therefore, the Court will also dismiss the claims against Terry Elliot and Maria Powell.

---

[58]*Id.* at 918 (quoting *Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1576-77 (10th Cir. 1993).

[59]*Nat'l Credit Union Admin. Bd. v. Keeling*, 1996 WL 331091, at *3 (E.D.N.Y. May 31, 1996).

[60]*Id.*

[61]12 U.S.C. § 1787(p)(2).

## IV.  REMAINING MOTIONS

The remaining motions include Cross/Counterclaim Defendants' Motion to Dismiss;[62] Crossclaim Defendant Judy L. Smith's ("Smith") Motion to Strike Third-Party Complaint and to Dismiss Third-Party Complaint for Lack of Subject Matter Jurisdiction and Joinder in Motion to Dismiss;[63] and Cross/Counterclaimant Castle Stone's Motion for Leave to Recharacterize or Add Parties.  After reviewing the parties' respective arguments, the Court finds that Cross/Counterclaim Defendants' Motion to Dismiss[64] should be granted in part and, as Smith has joined in these arguments, the Court will also dismiss the claims against Smith on those same grounds.  Having decided that Castle Stone's cross/counterclaims should be dismissed against Smith, the Court finds Castle Stone's Motion moot and will deny the Motion.

A.       BACKGROUND

 In Castle Stone's Answer, Counterclaim, and Crossclaim, Castle Stone alleges that Cross/Counterclaim Defendants are liable to Castle Stone for fraud and misrepresentation, defamation and false light, tortious interference with contractual or business relationships, civil conspiracy, and punitive damages.

Castle Stone's fraud and misrepresentation claims are alleged against those Cross/Counterclaim Defendants who entered into Client Contracts with Castle Stone.  Castle Stone alleges that these Cross/Counterclaim Defendants fraudulently misrepresented their ability

---

[62]Docket No. 39.

[63]Docket No. 41.

[64]Docket No. 39.

to pay for their homes under the Client Contracts, which misrepresentations induced Castle Stone to enter into the Client Contracts with them.

Castle Stone's remaining allegations stem from Cross/Counterclaim Defendants' conduct prior to filing of this suit. Castle Stone alleges that these individuals and entities contacted Castle Stone's customers and clients numerous times and encouraged them to attend meetings held at the offices of Ford & Huff LC to discuss potential claims against Castle Stone. Castle Stone alleges that these communications contained libelous statements which defamed Castle Stone and presented Castle Stone in a false light. Castle Stone further alleges that these communications encouraged the recipient to breach their Client Contract with Castle Stone, constituting an intentional interference with contractual relationships.

At the meetings held at Ford & Huff LC, Castle Stone alleges that Cross/Counterclaim Defendants Adam Ford, Matthew Crane, and Ford & Huff LC made additional slanderous statements which defamed Castle Stone and presented Castle Stone in a false light. Castle Stone further alleges that those at the meeting intentionally formed and operated a civil conspiracy for the purpose of deliberately damaging Castle Stone.

B.      DISCUSSION

*1.      Cross/Counterclaim Defendants' Motion to Dismiss*

Cross/Counterclaim Defendants move to dismiss all of Castle Stone's claims against them under Rule 12(b)(6) because they fail to state a claim upon which relief may be granted. Specifically, Cross/Counterclaim Defendants argue that each of Castle Stone's claims should be

dismissed because the statements and actions which form the basis of Castle Stone's claims are privileged and protected under the judicial proceedings privilege.

In Utah, "[t]he general rule is that judges, jurors, witnesses, litigants, and counsel involved in a judicial proceeding have an absolute privilege against suit alleging defamation."[65] This privilege is called the judicial proceeding privilege. Underlying this rule is the policy of "encouraging full and candid participation in judicial proceedings by shielding the participant from potential liability for defamation."[66] "[T]he 'privilege is premised on the assumption that the integrity of the judicial system requires that there be free and open expression by all participants and that this will only occur if they are not inhibited by the risk of subsequent defamation suits.'"[67]

In light of these strong policy considerations, Utah courts have applied the judicial proceedings privilege to other contexts, including intentional interference with business relations,[68] abuse of process, invasion of privacy, intentional infliction of emotional distress, conversion, and civil conspiracy.[69] As explained by the *Price* court,

> The whole purpose of the judicial privilege is to ensure free and open expression by all participants in judicial proceedings by alleviating any and all fear that participation will subject them to the risk of subsequent litigation. There is no reason to distinguish statements that may defame a person from statements that

---

[65]*Krouse v. Bower*, 20 P.3d 895, 898 (Utah 2001).

[66]*Id.* at 899 (internal quotation and citation omitted).

[67]*Id.* (quoting *Allen v. Ortez*, 802 P.2d 1307, 1311 (Utah 1990)).

[68]*See Price v. Armour*, 949 P.2d 1251, 1258 (Utah 1997).

[69]*See Moss v. Parr*, 197 P.3d 659, 661 (Utah Ct. App. 2008).

may interfere with that person's business relations.  The purpose of the judicial privilege remains the same.  Holding that a defamatory statement made during a judicial proceeding is absolutely privileged but then holding that the privilege does not apply to the claim that the statement interfered with a business relation would defeat they very purpose of the privilege and would chill free and open expression in the judicial setting.[70]

Utah Courts have developed a three-part test for determining whether a statement falls within the judicial proceeding privilege.  "To establish the judicial proceeding privilege, the statement must be (1) made during or in the course of a judicial proceeding; (2) have some reference to the subject matter of the proceeding; and (3) be made by someone acting in the capacity of judge, juror, witness, litigant, or counsel."[71]

The first requirement—that the statement be made during or in the course of a judicial proceeding—is interpreted broadly, and includes "communication that is preliminary to a proposed judicial proceeding."[72]  Thus, Utah courts have held that statements are protected "not only when made in the institution of proceeding or in the conduct of litigation before a judicial tribunal, but in conferences and in communications preliminary thereto."[73]

To satisfy the second requirement—that the statement have some reference to the subject matter of the proceeding—the statement need not be relevant or pertinent from an evidentiary point of view, but only have "some relationship to the cause or subject matter involved."[74]

---

[70]*Price*, 949 P.2d at 1258.

[71]*Krouse*, 20 P.3d at 898 (internal quotation marks and citations omitted).

[72]*Id.*

[73]*Id.* (internal quotation marks and citation omitted).

[74]*Id.* at 900.

The third requirement—that the statement be made by someone acting in the capacity of judge, juror, witness, litigant, or counsel—is self evident and requires no elaboration.

Turning to the specific allegations at issue in this case, the Court finds that Castle Stone's claims for defamation (Third Cause of Action), false light (Fourth Cause of Action), tortious interference with contractual or business relationships (Fifth Cause of Action), and civil conspiracy (Sixth Cause of Action) are all based on actions and communications protected by the judicial proceedings privilege and therefore cannot state a claim for relief. Each of these claims turn on statements and actions made preliminary to a judicial proceeding, which all relate to this proceeding, and were made by those involved in the litigation.

Castle Stone argues that the privilege does not apply because the alleged statements were made in the presence of Smith and other third parties, making the statements excessively published. As noted by Utah courts, excessive publication destroys the judicial proceedings privilege.[75] For a statement to be excessively published, the statement must be "published to more persons than the scope of the privilege requires to effectuate its purpose."[76] In other words, the statement must be published to those "who did not have a legitimate role in resolving the dispute," or "to persons who did not have an adequate legal interest in the outcome of the proposed litigation."[77]

---

[75]*Id.*

[76]*Id.*

[77]*Id.*

The only third-party specifically identified by Castle Stone is Smith—a realtor who worked with some of the litigants. Although Smith is not a litigant, based on her involvement and interest in the outcome of this litigation, Smith's presence does not destroy the litigation privilege. Therefore, the Court will grant the Motion as to Castle Stone's Third, Fourth, Fifth, and Sixth Causes of Action.

The Court finds the privilege inapplicable, however, to Castle Stone's First and Second Causes of Action for fraud and misrepresentation. These claims allege that those Cross/Counterclaim Defendants who entered into Client Contracts with Castle Stone committed fraud by allegedly falsely stating their ability to pay-off the mortgage loans. These alleged statements were made at the beginning of the parties' contractual relationship and well before litigation was ever contemplated. Therefore, the privilege is inapplicable to these causes of action.

As a final matter, the Court notes that Castle Stone has appeared to plead a separate cause of action for punitive damages (Seventh Cause of Action). As alluded to by Cross/Counterclaim Defendants in their reply memorandum, "[u]nder Utah law, no separate cause of action for punitive damages exists."[78] Therefore, the Court will dismiss Castle Stone's claim for punitive damages as a separately pleaded cause of action. The Court notes that Castle Stone can continue to pursue punitive damages, provided it can prevail on a claim which will support an entry of

---

[78] *Velocity Press, Inc. v. Key Bank, N.A.*, 2010 WL 5300903, at *9 (D. Utah Dec. 21, 2010) (citing *Norman v. Arnold*, 57 P.3d 997, 1006 (Utah 2002)).

such damages.  "In other words, the Court will allow [Castle Stone] to pursue punitive damages as a *remedy*, not as a separate cause of action."[79]

       *2.      Smith's Motion to Dismiss*

In her separate Motion to Dismiss, Smith joins in the judicial proceedings privilege arguments proffered by Cross/Counterclaim Defendants.  As Smith never entered into a Client Contract, the First and Second Causes of Action are inapplicable to her.  Upon reviewing Castle Stone's claims against Smith, the Court finds the judicial proceeding privilege likewise applicable to Smith.  Although she is not a litigant, she is an involved party and a witness to the events which are at issue here.  Her involvement in this dispute furthers the policies underlying the litigation privilege and should therefore be protected.  Therefore, any alleged statements attributed to her are privileged and cannot form the basis of liability.  The Court will therefore grant Smith's motion to dismiss the causes of action alleged against her.[80]

       *3.      Castle Stone's Motion to Recharacterize*

 Because the Court grants Smith's Motion to dismiss, Castle Stone's Motion to Recharacterize or Add Parties will be denied as moot because the motion only relates to claims alleged against Smith.

---

[79]*Id.*

[80]Although not raised by the parties, the Court notes that dismissing the causes of action against Smith prior to deciding whether this Court has subject matter jurisdiction over Castle Stone's claims against her is appropriate.  As noted by the Tenth Circuit, "[o]ccasionally a court may rule that a party loses on the merits without first establishing jurisdiction because the merits have already been decided in the court's resolution of a claim over which it did have jurisdiction."  *Starkey v. Boulder County Social Services*, 569 F.3d 1244, 1260 (10th Cir. 2009).

## V. CONCLUSION

It is therefore

ORDERED that Castle Stone Homes, Inc., Martin Tanner, Mills Crenshaw, and Robert Wright's (collectively, "Castle Stone") Motion to Dismiss (Docket No. 66) is GRANTED as to Plaintiffs' Fourth Cause of Action, Plaintiffs' Eighth and Ninth Causes of Action as to Defendants Martin Tanner, Mills Crenshaw, and Robert Wright, and Plaintiffs' claim for conversion as part of their Eleventh Cause of Action and DENIED as to all others. It is further

ORDERED that the National Credit Union Administration Board's ("the NCUAB") Motion to Dismiss (Docket No. 68) is GRANTED. It is Further

ORDERED that Cross/Counterclaim Defendants' Motion to Dismiss (Docket No. 39) is GRANTED as to Castle Stone's Third, Fourth, Fifth, Sixth, and Seventh Causes of Action and DENIED as to Castle Stone's First and Second Causes of Action. It is further

ORDERED that Crossclaim Defendant Judy L. Smith's Motion to Strike Third-Party Complaint and to Dismiss Third-Party Complaint for Lack of Subject Matter Jurisdiction and Joinder in Motion to Dismiss (Docket No. 41) is GRANTED. Finally, it is

ORDERED that Cross/Counterclaimant Castle Stone's Motion for Leave to Recharacterize or Add Parties (Docket No. 50) is DENIED AS MOOT.

DATED March 15, 2011.

BY THE COURT:

_____

TED STEWART
United States District Judge

30